## UNION GOLD MINING CO. v. ROCKY MOUNTAIN NATIONAL BANK.

CORPORATION — *dissolution in collateral proceeding.* A corporation cannot be dissolved in a collateral proceeding; and in a suit by a national bank to recover money loaned, if the corporation has not been dissolved in a direct proceeding to that end, the defendant cannot question its existence.

CORPORATION — *dissolution of a national bank.* According to section 53 of the act relating to national banks (13 Stat. at Large, 99), a forfeiture of the rights and privileges of a banking association must be determined and adjudged in a suit instituted by the comptroller of the currency in his own name, and an association organized under that act must stand until dissolved in that way.

PLEADING — *must answer all that it professes to meet.* A plea which goes to the whole declaration and contains an answer to but one count, is bad on demurrer.

| | |
|---|---|
| 1 | 531 |
| 2 | 252 |
| 2 | 268 |
| 2 | 566 |
| 9 | 54 |
| 13 | 75 |
| 13 | 76 |
| 1 | 531 |
| 16 | 127 |
| 24 | 232 |
| 1 | 531 |
| 14a | 272 |

CONTRACT PROHIBITED BY LAW, *when void.* A contract to do a thing prohibited by statute is not necessarily void, if the statute visit the unlawful act with a penalty. If the thing prohibited is *malum in se*, the contract cannot be enforced, but as to things not immoral or against public policy, it may be sufficient to enforce the statutory penalty only. If it was not the intention of congress to make void a contract made contrary to the provisions of the act it will be enforced, and for the violation of law the penalty which the statute gives may be applied. Whatever consequences are to follow the violation of the act are expressed in the act itself, and one penalty being given, the court is not at liberty to add another.

CONSTRUCTION *of section* 29, *of National Bank Act.* Section 29, of the act relating to national banks, contains a direction respecting the management of associations organized under the act, and it is not a limitation upon the powers of such associations.

CONTRACT — *prohibited by law* — *recovery on.* An action may be maintained by a national bank to recover money loaned exceeding in amount one-tenth part of its capital stock, notwithstanding the prohibition of section 29 of the act under which it was organized.

AGENT OF MINING COMPANY — *authority.* A superintendent of a mine, with authority to take ore therefrom, and crush it for the purpose of obtaining gold, cannot upon such authority borrow money in the name of his principal.

CORPORATION — *presumption as to officer's acts.* The president of a corporation cannot put off his official character at will and deny to those who have business with the corporation, access through him. While acting upon the business of the corporation, all his acts, within the scope of his authority as president, must be regarded as official.

EVIDENCE *of agent's authority to bind his principal.* In an action against a mining company for money borrowed by its agent without authority, where evidence.is offered of admissions made by the president of the company, such president may be examined as to his authority to bind the company in relation to the matter in suit.

CORPORATION — *power of president.* The president of a corporation has power to convene the board of directors for the purpose of laying before them any matter affecting the business of the corporation.

AGENT — *authority of president of a corporation.* An undertaking of the president of a corporation to bring before the board of directors, at a time specified, a demand against the corporation for money borrowed by an agent of the corporation, is within the scope of his authority as president, and the corporation is bound to consider the demand at the time specified.

AGENT — *ratification of unauthorized act of.* Where an agency exists, and the agent exceeds his authority, the silence of the principal may give rise to a presumption of an intentional ratification of the unauthorized act.

The circumstances must have been fully understood by the principal before any inference can be drawn from his silence, and they must have been such as not only afforded an opportunity to act or speak, but such, also, as

would properly and naturally call for some action or reply from men similarly situated.

In an action against a corporation to recover money borrowed by its agent without authority, it appeared that the company was notified of the indebtedness on the 16th December, 1868; fifteen days later, the president undertook to present the claim to the board of directors at a meeting to be held in February following, and the corporation disavowed the act of its agent in the spring following. *Held*, that upon these facts, the jury would have been warranted in finding a ratification of the agent's acts.

PRACTICE — *ratification of unauthorized act of agent — how determined.* Where the position of the parties remains the same, whether ratification of the unauthorized act of an agent shall be inferred from the delay of the principal to disavow such act, is a question for the jury.

EVIDENCE *of ratification of agent's acts.* In an action against a mining company to recover money borrowed by its agent without authority, the circumstance that the company retained the ore taken from the mine by the use of the money is not material to the question of ratification.

Nor is it competent to show that the money was expended in the mine or that the expenditure was advantageous to the company, unless it is also shown that the company had knowledge of the loan and of the expenditure. These circumstances are in no way connected with the authority of the agent, or the ratification of his acts by the company.

EVIDENCE — *as to witness' bias or prejudice.* A witness cannot be asked whether he is indebted to one of the parties to the suit for the purpose of showing the disposition of his mind toward such party. The question does not tend to elucidate the point.

EVIDENCE — *as to corrupt agreement between witness and party.* Where it is alleged that a witness refused to testify until the party who called him had made an arrangement concerning certain indebtedness, the character and terms of the arrangement must be made known in order that the court may determine whether it would go to his credibility.

## *Appeal from District Court, Jefferson County.*

THE declaration contained a count for money loaned; a count for goods sold and delivered; a count for money had and received by defendant; a count for money paid, laid out and expended; a count for interest, and a count on an account stated.

The defendant pleaded non assumpsit, and also specially that the plaintiff is a body corporate, with a capital of $50,000, and that, under and by virtue of a law of the United States, entitled "An act to provide national currency," etc., it had no power, right or authority to loan

and advance to defendant the sum of money in the declaration mentioned.

In another special plea the defendant alleged that the plaintiff was a body corporate, organized under the act entitled "An act to provide a national currency," etc., reciting the provisions of the act, and averring "that certain persons did, at the time specified, form an association, with a capital stock of $50,000," which was the plaintiff, and that the plaintiff had no power, authority or right to loan and advance to defendant the sum of money in the declaration mentioned.

In another plea the defendant averred that the plaintiff was a body corporate, etc., and had no right, power or authority to loan or advance to defendant a greater sum than $5,000.    Another plea was substantially the same, except that it averred that only $30,000 of the plaintiff's capital stock had been paid in.    A demurrer to the special pleas was sustained.

The testimony at the trial was voluminous.    Plaintiff introduced evidence tending to prove that George K. Sabin was appointed superintendent of the defendant's mine, in the year 1865 ; that he remained such superintendent until December, 1868 ; that, during the years 1867 and 1868, Sabin kept a deposit account with plaintiff in defendant's name, and that he drew money from time to time in the name of defendant, and deposited other money to the credit of the account ; that the balance against defendant in December, 1868, was $21,217.06 ; that Sabin worked defendant's mine in the years 1867 and 1868, taking therefrom a large quantity of valuable gold-bearing ore, and crushing a portion thereof for the purpose of obtaining gold ; that the gold thus obtained was deposited in plaintiff's bank to the credit of defendant ; that the money obtained by Sabin from plaintiff's bank was expended in operating the mine and in crushing the ore.    Several letters were introduced by plaintiff, which were written by Becker, the president of defendant, some of which were addressed to Sabin as superintendent.    One of the letters was signed by Becker as president.

There was evidence of several interviews between Becker and the officers of the bank, in relation to the indebtedness, in December, 1868. A communication from Becker, to the president of the bank, which was given in evidence, is as follows :

ROCKY MOUNTAIN NATIONAL BANK, }
CENTRAL CITY, COLORADO, *Jan.* 1, 1869. }

*To the President of the Rocky Mountain National Bank :*

SIR — In regard to the overdraft of our company on your bank, permit me to say that, although I am the president of the Union Gold Mining Co., and the owner of a majority of all its stock, Mr. Sabin will do me the justice to state that I had no knowledge of any overdraft, until on or about the middle of December last. I hope you will not feel uneasy about the payment. We have an abundance of ore already broken in the mine, to pay all indebtedness of the company. In fact, this is the only indebtedness I have any knowledge of the company owing, and if it is not paid off out of the mine, I propose to call a meeting of our directors, and submit your claim, and make an assessment at our February meeting (in New York city), to pay off your claim, and any other that the company may owe. I will also state to you clearly and plainly, that there shall be no sales, transfers, mortgages, assignments, deeds of trust, or any other incumbrance put on the property of company in Colorado, or elsewhere, by myself, or by the company, until all the liabilities of the said company are fully paid.

Very respectfully,
Your obedient servant,
THEODORE H. BECKER.

On cross-examination of the witness, Sabin, the defendant offered to show by him that hew as indebted to plaintiff in a large sum of money, and that, at a previous term of the district court, he absented himself from the court, and that, when he appeared as a witness, he refused to testify till the indebtedness was arranged in some way,

and such arrangement put into writing and signed by the plaintiff, and that, since the last term of court, the said matter of indebtedness had been arranged according to the terms required by the witness.

Upon the plaintiff's objection, the testimony was excluded.

The defendant introduced testimony tending to prove that Sabin resigned his agency in April, 1866, and that in the fall of that year he made an arrangement with the defendant, by which he was to work the mine upon his own account, and lay up the first-class ore for the company for the use of the mine.

T. H. Becker testified: That, on the 16th of December, 1868, he wrote the company of the indebtedness to the bank, and that was the first knowledge the company had of the indebtedness.

The defendant offered to prove by Mr. Becker, the nature of his authority from the defendant in respect to the indebtedness due the plaintiff. Upon plaintiff's objection this evidence was rejected.

The charge of the court to the jury was as follows:

If the jury believe that George K. Sabin entered into an arrangement or agreement with the defendant, whereby he was to enter into possession and work the mines of the defendant, at his own expense, and not at the expense of the defendant, and pay to the defendant a certain portion of the ore taken from the mines for the use of the mines, and pay himself and all the expenses of working the mines from the balance of the ore taken from the mines, and that, under the arrangement so made with the defendant, the said Sabin entered into and worked the mines of the defendant; then, the relation existing between the said Sabin and the defendant was not that of principal and agent, but that of landlord and tenant, and is governed by the same law as in case of working land for a share of the crops. And the said Sabin became the lessee of the defendant, and the said defendant is in no way liable for any sum of money borrowed by the said Sabin, and cannot be made liable without a special

promise in writing, made and signed by the defendant.   That a corporation is bound by the contracts and acts of its agent, so far as the agent acts within the scope of the authority conferred upon him by the corporation, but no further.

If the jury believe, from the evidence, that George K. Sabin made an agreement or arrangement with the defendant, whereby he was to enter into the mines of defendant and work the same on his own account, and was to mine and deliver to the defendant, on the top of the ground, all the first-class or smelting ore, as rental or tribute for the use of the mines of the defendant, and was to receive no salary from the defendant for his services, but was to pay himself and all expenses of working the mine from the proceeds of the balance of the ore mined from said mines, and that the defendant was not to furnish any money for the working of said mines, and that Sabin was to contract no debts chargeable to the defendant, but was to quit work on said mines whenever he could not pay all expenses and pay himself from the lower grades of ore, then the jury must find for the defendant in this case.

If the jury believe, from the evidence, that Becker was president and general manager of the defendant in 1868 and 1869, and that the defendant had, by George K. Sabin, claiming to be the superintendent or agent of defendant, obtained money of the plaintiff, and that Becker, while acting as president of defendant, with full knowledge of the facts, admitted that such money so obtained was due from the defendant to plaintiff, such admission may be taken by the jury in considering whether the defendant is or is not indebted to the plaintiff.

If the jury believe, from the evidence, that the defendant employed George K. Sabin as its superintendent, in April, A. D. 1865, and that instructions were, at that time, sent in a letter to said Sabin by the president of the defendant, and that Sabin, under said appointment, proceeded to work the mine and mill of the defendant in Central City, where the plaintiff is located, and to make contracts for the defendant from the fall of 1865 until the spring or summer of 1866,

and then stopped working until the fall of 1866, and then resumed said work, and continued said work until December, 1868; and that, during the time from the fall of 1866 until December, 1868, George K. Sabin contracted the debt sued for in this case on behalf of the defendant, and used the money received from the plaintiff in working defendant's mine, and for the defendant, and the defendant received the benefits of the work, knowing that the money had been so applied, then the plaintiff is entitled to recover, unless the defendant has shown that the plaintiff had notice of the change of his agency as sworn to by witnesses Becker, Potts, Bennell, Jr., and Brevoort, in this case.

The court is asked to instruct the jury that the plaintiff is not compelled to prove the appointment of Sabin as superintendent or agent of defendant, by resolution of the board of directors, but the jury may take into consideration all the testimony on that subject, including the acts of the witness Sabin in and about the property of the defendant, and the manner in which the business was carried on, and the opportunities the officers of the defendant had to know how the business was conducted.

The court is asked to instruct the jury that, if Sabin, claiming to be the agent of the defendant, purchased goods on credit in the name of the defendant, and afterward defendant, with full knowledge of all the facts, paid said debt, such payment is a ratification of such agency of said Sabin in making such debts.

If the jury believe, from the evidence, that Theodore H. Becker was president of the defendant in years 1867, 1868 and 1869, and that while he was president he had the active charge or management of defendant's affairs, and while acting in that capacity he recognized George K. Sabin as superintendent or agent of the defendant, then the jury may take such recognition into consideration in determining whether Sabin was the agent of defendant, or defendant had allowed him to assume that he was agent. If the jury find for the plaintiff they will allow interest on the balance due at ten per cent per annum, from the first of January, 1869,

up to this time, except on the item included in plaintiff's account as interest.

If the jury believe, from the evidence, that, during the years 1867 and 1868, George K. Sabin was in the actual charge of the defendant's property, and while in charge of the defendant's property he represented to the plaintiff that he was the agent and superintendent of the defendant, and on the strength of that representation he borrowed money of the plaintiff, the mere fact that he stated to Hense, Smith & Davison that he was working said property on his own account, cannot affect the defendant's liability to the plaintiff, unless the plaintiff knew of these statements at the time the money was loaned.

The court instructs the jury that when one has the actual charge and management of the business of a corporation, with the knowledge of the members and directors, this is evidence of his authority, without any vote or other corporate act constituting him agent of the corporation, and the company will be bound by his contracts, made on their behalf, within the apparent scope of the business intrusted to him. Power to act generally in a particular business or a particular course of trade, in a particular business, however limited, would constitute a general agency.

In general, when an agent is authorized to do an act, and transcends his authority, it is the duty of the principal to repudiate it as soon as he is fully informed of what has been done in his name, by the agent, else he is bound by the act as having ratified it by implication.

The court instructs the jury that, if they believe from the evidence that Sabin held himself out as agent of the defendant, and, while so holding himself out, drew money out of the plaintiff's bank and used the same in working and mining the property of the defendant, and the defendant retained and kept the profits arising and growing out of such working and mining, with the knowledge that the money was so borrowed and applied, then the defendant is liable to the plaintiff for such money, unless it is proved

that the plaintiff knew that Sabin had no authority to draw money out of plaintiff's bank.

If the jury find, from the evidence, that George K. Sabin was the agent of the defendant, and the extent of his authority was defined in a private letter of instructions, then no duty existed on the part of the bank to make inquiries as to any private letter of instructions from the principal to the agent, for such instructions may well be presumed to be of a secret and confidential nature, and not intended to be divulged to other persons.

If the jury believe, from the evidence, that Sabin was not the agent of the defendant, but that the defendant allowed him to work its mine and hold himself out as agent for some considerable time, and Sabin, while so holding himself out as agent of defendant, obtained money of the plaintiff in the name of the defendant, and used the money in mining the property of the defendant, and that the ore taken out by Sabin, by the use of such money, was retained and kept by the defendant with the knowledge of the fact that the money was so used, then the defendant is liable.

The court instructs the jury that if they believe, from the evidence, that George K. Sabin was the agent of the defendant, and, while acting as agent, borrowed the sum of money in controversy of the plaintiff, and expended the same in the business of the defendant and in paying its debts; that the money so advanced by the plaintiff, though so applied, creates no debt against the defendant, but that the jury must further find, from the evidence, before they can find for the plaintiff, in addition to the mere fact of the loan from the plaintiff to Sabin, and the application of the money for the benefit of the defendant, that the defendant had authorized the plaintiff to loan the money to Sabin, or Sabin to borrow the money in controversy from the plaintiff, or had afterward ratified and adopted the act. And the court instructs you that, if the money so borrowed from the plaintiff was applied by Sabin to the taking ore out of the defendant's mine, and that said ore, when thus taken

out, was kept by the defendant, the said defendant having knowledge that the money had been so applied, that that would amount to an adoption of Sabin's acts, and knowledge to the president would be knowledge to the corporation.

The jury returned a verdict for the plaintiff for $27,034.96.

A motion for new trial was made and overruled, and judgment was rendered on verdict.

Mr. E. WAKELEY, Mr. G. B. REED and Mr. HUGH BUTLER, for appellant.

Messrs. JOHNSON & TELLER, Messrs. CHARLES & ELBERT and Mr. W. R. GORSLINE, for appellee.

HALLETT, C. J. Appellant is a mining corporation organized in New York, which owns and operates mines in this territory. T. H. Becker, at first a trustee, and more recently president of the corporation, was in the territory during a portion of the time mentioned in this record, but the evidence does not show that any other officer or shareholder was ever in the territory. In 1865, George K. Sabin was appointed superintendent of the company's mine in Gilpin county, and conducted its affairs until October of that year, when work was discontinued. At the trial, appellant contended, and introduced testimony to prove, that Sabin resigned his agency in the spring of 1866, and that, in the fall of that year, he entered into an agreement with the company by which he was to work the mine on his own account and render to the company the first-class ore. Appellee's testimony on this point tended to prove that Sabin's agency continued until December, 1868, and so the jury found the fact to be. In the years 1867–68, Sabin kept a deposit account in the bank in appellant's name, which, by frequent overdrafts, he increased to the large amount for which, with interest, judgment was rendered against appellant.

In four special pleas appellant alleged that the bank was not able to contract an indebtedness exceeding in amount ten per cent of its capital stock, setting forth the amount of

the stock and other facts to show the alleged incapacity, and, in another plea, the organization and capital stock of the bank is set out, apparently with a view to claim a forfeiture of the charter of the bank, pursuant to section fifty-three of the act under which it was organized. 13 Stat. 99. As to the forfeiture of the charter, it is well settled that a corporation cannot be dissolved in a collateral proceeding, and I do not think that appellant can question the existence of the bank in this way. Angell & Ames on Corporations, § 777; *Robinson* v. *London Hospital,* 11 Hare (44 Eng. Ch.) 24. Section fifty-three provides that the violation of the provisions of the act, which shall work a forfeiture of the rights and franchises of the association, shall be determined and adjudged by a proper circuit, district or territorial court of the United States, in a suit brought by the comptroller of the currency, in his own name, before the association can be declared dissolved, and the bank must stand until dissolved in this way.

The special pleas, in which incapacity of the bank to contract the indebtedness is asserted, go to the whole declaration, and at best answer only the count for money loaned, and therefore the demurrer was properly sustained. In another trial the question may possibly arise on the evidence, and for this reason it may be necessary to make some suggestions as to the true meaning and effect of section 29 of the National Bank Law. That section was obviously intended to protect the shareholders and creditors of a bank organized under the act against an unwise use of its funds, and to this end it was necessary that the duties of the officers of the bank should be defined. I do not perceive that it was equally necessary that the power of the corporation, in relation to loans, should be circumscribed, for the mischief would arise out of the conduct of the officers, rather than the power of the bank. In section 8 the powers of the bank are enumerated, that of loaning money among others. If section 29 is to be regarded as limiting this power, the bank would be unable to recover that which rightfully belonged to it, and this section would tend to accomplish

the ruin which it was designed to prevent.   In the well-considered case of *Harris* v. *Runnels*, 12 How. 79, it was said that a contract to do a thing prohibited by statute, is not necessarily void if the statute visit the unlawful act with a penalty.   If the thing prohibited is *malum in se*, the contract cannot be enforced, but as to things not immoral or against public policy it may be sufficient to enforce the statutory penalty only.   Accordingly it was recently decided in Maryland that a provision in the charter of a bank prohibiting any director or other officer under penalty of fine or imprisonment from borrowing money from the bank, does not exempt a director from liability for money loaned to him in violation of the prohibition.   *Lester* v. *Howard Bank*, 33 Md. 558.

If it was not the intention of congress to make the contract void, it will be enforced, and for the violation of law the penalty which the statute gives may be applied.   That penalty attends every violation of the act, and is found in section 53.   Another and additional penalty is attached to some of the acts prohibited by the statute, as for instance in section 30, it is provided that taking illegal interest shall work a forfeiture of the entire interest, and failure to comply with the provisions of sections 31 and 32 may result in the appointment of a receiver to wind up the business of the bank.   This may show that, whatever consequences were to follow the violation of the act are expressed in the act itself, and where one penalty is given I do not think we are at liberty to attach another.   We are not to give to section 29 a construction which will defeat the purpose for which it was enacted, and such will be the effect if we deny the right of the bank to recover money which it has paid out.   I am persuaded that this section is to be regarded as a direction respecting the management of the bank, and not as a limitation of its powers, and that the rule *pari delicto* is not applicable to this case.

It will not be necessary to consider whether Sabin was agent of the company at the time of the transactions with the bank.   The evidence was conflicting, and for the pur-

poses of this discussion I accept the finding of the jury on that point. As to the nature and extent of his agency, it has not been contended that his dealings with the bank were within the scope of his authority. It would be difficult to maintain that a superintendent of a mine, with authority to take ore therefrom and crush it, for the purpose of obtaining gold, can, upon such authority, borrow money in the name of his principal, even if the money be used in carrying on the mine. Undoubtedly, the transactions with the bank were beyond Sabin's authority as agent, and we are now to consider whether there is evidence to show a ratification of his acts by the company.

It does not appear that the company was informed of the indebtedness to the bank prior to December 16, 1868, at which time Becker, the president, communicated such information by mail. There is some testimony to the effect that Becker had earlier information of the indebtedness, but he denies it, and as we cannot know how a jury may determine the fact, we must assume that his statement is correct. At this time the officers of the bank were pressing Becker for payment of the indebtedness, and, although he denied Sabin's authority to contract the indebtedness, he did not repudiate the demand, but expressed a willingness to pay it. On the 1st of January following, he executed to the president of the bank a paper, in which he speaks of the indebtedness as "the over-draft of our company on your bank," and says, "I hope you will not feel uneasy about the payment; we have an abundance of ore already broken in the mine to pay all indebtedness of the company. In fact, this is the only indebtedness I have any knowledge of the company's owing, and if it is not paid off out of the mine, I propose to call a meeting of our directors and submit your claim, and make an assessment at our February meeting (in New York city) to pay off your claim and any others that the company may owe."

Becker states that he wrote this letter under an impression that the company had made some different arrangement with Sabin, and that he refused to sign it as president,

not wishing to bind the company — but this will not affect the character of the letter. The president of a corporation is presumed to know something of its affairs, and the evidence in this case shows that Becker was better acquainted with the business of the company than any other of its officers. He does not state the nature of the arrangement which he supposed the company had made with Sabin, or from what source he derived his impression that such arrangement existed. He had been in communication with his company in regard to Sabin's dealings with the bank, and was at that time its only representative in the territory. If he was acting upon false information he ought to have stated by whom and how he was misled. Nor can the president of a corporation put off his official character at will and deny to those who have business with the corporation, access through him. If an officer of a corporation may, at pleasure, assume the status personal and deny his relations with his principal, it will be impossible to deal with a corporation except at the will of the officers. He was acting upon the business of the company, and all his acts within the scope of his authority as president must be regarded as official. In the evidence it is shown that the president exercised a very general authority in the management of the affairs of the company. When Sabin was appointed superintendent in April, 1865, Creswell, then president, gave him instructions as to the manner of working the mine, and in the fall of that year the work was discontinued by order of the president. Sabin's reports of affairs at the mine were always made to the president, and in December, 1868, Becker, then president, stopped the work and took charge of the mine, and proceeded to adjust the unsettled accounts of the company. Becker states that he used his own funds in paying the debts incurred by Sabin for labor and supplies, but it may be fairly inferred that he was acting for the company in taking possession of the mine. If we regard the payment of the bills as the exuberance of a generous heart, there are other acts of his presidency and of his predecessors in office, done appar-

ently with the knowledge and approval of the directors of the company, which go far to establish the general authority of the president to manage and control the affairs of the company. But this evidence of the authority of the president was not directly to the point, that he was authorized to settle and adjust the debts of the company, and appellant was not allowed to interrogate Becker as to his authority in this matter.

Under our statute Becker was competent to testify, and his authority to bind the company was in issue before the jury, and therefore the evidence should have been received. If, however, Becker had no authority to pledge the company to the payment of any indebtedness, he certainly had authority to convene the board of directors and lay before them the claim of the bank, and this he agreed to do. In the usual course of business a corporation is addressed through its president, and it is an important duty of the executive officer to bring to the knowledge of the board of directors any matter affecting the interest of the corporation.

In *Fulton Bank* v. *New York and Sharon Canal Co.*, 4 Paige, 137, the court said: " It is well settled that notice to an agent of a party whose duty it is, as such agent, to act upon the notice or to communicate the information to his principal in the proper discharge of his trust as such agent is legal notice to the principal; and this rule applies to the agents of corporations as well as others." So, also, in *National Bank* v. *Norton*, 1 Hill, 578, it was said that notice given to the directors of a bank, for the purpose of being communicated to the board of directors, would be sufficient to charge the corporation with knowledge of the fact stated in the notice. This is upon the rule that the principal shall be responsible for the acts and omissions of his agent within the line of the agent's duty. Upon this rule it appears to me that Becker's undertaking to bring the claim of the bank before the board of directors of his company at the February meeting, bound the company to consider the claim at that time. The undertaking was an

exercise of the executive function, and we are at liberty to presume that it was performed. Upon the evidence it seems that notice of the indebtedness was given to the company December 16, 1868. Fifteen days later Becker undertook to present the claim to the board of directors at the February meeting in New York. If the matter was acted on by the company, it does not appear that any notice of the result was given to the bank. Becker states that he told appellee's attorney, in the spring of 1869, that the company refused to pay, but the exact time is not fixed. Upon these facts the jury would have been warranted in finding that the company had ratified Sabin's dealings with the bank, for, where an agency exists, and the agent exceeds his authority, the silence of the principal may give rise to a presumption of an intentional ratification of the unauthorized act. Story's Agency, 256, *et seq.* The circumstances must have been fully understood by the party before any inference can be drawn from his silence, and they must have been such as not only afforded an opportunity to act or speak, but such also as would properly and naturally call for some action or reply from men similarly situated. 1 Greenl. Ev., § 197.

The matter of Sabin's dealings with the bank appears to have been fully explained to Becker, and by his statement the company was equally well informed. The circumstances called for an answer from the company. Money had been obtained by its agent and upon its credit, and the bank was demanding payment. The president of the company acknowledged the justice of the demand, and if the company had any objection to it, it was reasonable to believe that such objection would be made known. Where the delay on the part of the principal to disavow the agency will result in loss, and where the transaction may turn out a profit or loss according to circumstances, the principal must disavow the act of the agent within a reasonable time after notice. *Culver* v. *Ashley*, 1 Am. L. C. 719, note; *Hortons* v. *Townes*, 6 Leigh. 47.

In *Corser* v. *Paul*, 41 N. H. 24, it is said: "There is a

class of admissions which may be either express, or implied from silence or acquiescence. Such are admissions which have been acted upon, or those which have been made to influence the conduct of others or to derive some advantage to the party, and which, therefore, cannot be denied without a breach of good faith."

Upon this it would seem that if the appellant, with knowledge that Sabin was obtaining money from the bank, had stood by and allowed him to go on without objection, it would have been estopped to deny his authority. There is, however, nothing of this kind in the evidence, nor does it appear that the position of the parties would have been different if the company had promptly disavowed the acts of its agent. The question is as to the intention of the company respecting Sabin's dealings with the bank, to be determined upon evidence of its conduct and the declarations of its authorized agents, within the scope of their authority. If at any time the company assented to the acts of its agent, it is as much bound by those acts as it would have been if the agent had been clothed with authority to perform them. The negotiations with Becker, the notice to the company of the indebtedness, the agreement to consider the matter at the February meeting of the board of directors, and the delay of the company to disavow Sabin's acts are facts to be considered by the jury, whose province it is to determine the question of ratification. *Hortons* v. *Townes*, 6 Leigh. 47 ; *Corser* v. *Paul*, 41 N. H. 24.

Further discussion of the principal points in the case is unnecessary, and it remains to consider some questions which may arise upon another trial.

The circumstance that the company retained the ore taken from the mine is not material to the question of ratification. It is not like the purchase of a chattel by an agent without authority, which, if retained by the principal, affords evidence of his intention to ratify the purchase. In such case the principal acquires, by the act of the agent, property which he had not otherwise ; and if he disaffirms the contract he ought to restore the property to its rightful owner.

But here the ore belonged to the company, both before and after it was taken from the mine, and the bank never had any right to it whatever. If any inference is to be drawn from the fact that the ore was retained by the company, it arises out of an obligation to deliver it to some other party, and I do not perceive that any such obligation existed. Nor is it material that the money was expended in the mine, or that the expenditure was advantageous to the company, unless it is shown that the company had knowledge of the loan and of the expenditure. Whether the money was expended in the mine, and whether it resulted in gain or loss to the company, are matters in no way connected with the authority of the agent or the ratification of his acts by the company. If Sabin had authority to obtain money from the bank on behalf of the company, the liability of the latter is not affected by the use to which he appropriated it. A ratification has a retrospective effect, and takes effect as a prior command according to the maxim *omnis ratihabitio retrotrahitur, et mandato priori acquiparatur*. Therefore, if the act of the agent is ratified by the principal, the use of the money is equally foreign to the issue.

A witness may be interrogated as to his relations with the parties to the suit for the purpose of affecting his credibility. Obviously the testimony which it is proposed to draw out must have a tendency to prove the state and disposition of the mind of the witness toward one of the parties to the suit, and I do not see that proof of indebtedness to one of the parties has any such tendency. Upon our experience of human nature we cannot say that, as a rule, debtors are friendly or hostile to their creditors. Doubtless, in many cases, the circumstances of the debtor may lead him to seek the favor of his creditor, but it is impossible to lay down any general rule upon the subject. A matter of this kind may be safely left to the discretion of the judge sitting at the trial. Appellant also proposed to show that Sabin refused to testify until the bank had made an arrangement with him respecting his indebtedness to the latter, but we are not told what the arrangement was. If Sabin asked

favorable terms of payment, or that all or a portion of the indebtedness should be remitted to him, as a condition upon which alone he would testify, evidence of the fact would go to his credibility. A witness who demands compensation other than that which is given by law, for his testimony, is certainly to be regarded with suspicion. The offer, as made, however, did not disclose a corrupt bargain, or any circumstance which could influence Sabin's testimony, and hence it was rightly rejected.

Various questions are presented in the record, which it is deemed unnecessary to discuss. The issues were not presented to the jury upon the views here expressed, and therefore the judgment must be reversed, and the cause remanded with a *venire facias.*

*Reversed.*