Wilson, J.
This suit is based upon and was instituted by appellant to enforce.tbe following contract:
“ This agreement made and entered into this 15tb and 18th days of July, A. D. 1887, by and between Charles E. Wood *267 and Thomas E. Wood of Empire, Colorado, parties of the first part, and J. H. Casserleigh of Denver, Colorado, party of the second part, witnesseth:
“ That whereas the said parties of the first part, sons of the late William J. Wood, deceased, are desirous to recover at law or by settlement otherwise, all interest they may have or may have had in and to a certain mining claim located near Aspen, Colorado, in Roaring Forks Mining district known as the ‘Emma Mine,’ and now claimed by J. B. Wheeler and others, and as certain evidence necessary to establish the citizenship of the said Win. J. Wood, who was the locator of said mine, is now in the possession of said party of the second part, & procured by him at a large expense of money and use of time, and in consideration of the premises herein stated, we, the parties of the first part, each for ourselves do hereby agree to give unto the said party of the second part a two-thirds (2/8) interest in and to the amount recovered for us through law, if legal proceedings are commenced, and if a settlement is had without legal proceedings, then and in that case, the said second party or his assigns is to receive a one-quarter (1/Í) of all our said interest in and to the amount recovered by such settlement.
“ The said second party is to be at all cost in the matter. We to give our said testimony when called upon therefor. And such proceedings as are necessary to a settlement to be commenced forthwith by the second party or his assignee.
“Thomas E. Wood. [Seal]
“Chas. E. Wood. [Seal]”
The complaint alleged a compliance by plaintiff with all of the conditions of the contract on his part; that suit was instituted and prosecuted to a successful termination, and that thereby the defendants recovered large interests in numerous valuable mining properties, and a large sum of money. Defendants demurred to the complaint upon the ground, among others, that it showed upon its face that the contract sued upon was void, because it was champertous, and for the *268 further reason that it was in violation of section 815 of the General Statutes defining and prescribing a penalty for the offense of maintenance. The demurrer was overruled, and thereupon the defendants answered. The character of the answer it is not essential to state, because its contents are not necessary to the determination of the questions presented to this court. Case being brought to issue, when it came up for trial the plaintiff was called as the first witness in his own behalf. Before answering the first question in regard to the execution of the contract, objection was made to the taking of any testimony on behalf of the plaintiff upon the issues presented in the complaint, upon substantially the same ground as urged in the demurrer, which we have stated, except possibly there was one other ground specifically stated, and that is, the contract was against public policy and good morals.' The court, taking the same view of the question as did the counsel for defendants, sustained the objection, and a judgment of dismissal was rendered. Plaintiff appeals.
There are a number of assignments of error and several questions have jyeesi discussed by counsel, but in the state of the record of the case as it comes before us, we think that these questions all resolve themselves into one, and it is this only which we deem it necessary to consider; its determination will settle the case in this court. That question is, does the complaint state facts sufficient to constitute a cause of action, one upon which plaintiff would be entitled to recover if sustained ? It will be observed at the outset that the agreement of defendants was not a contract dependent upon a mutual promise for a consideration. The contract was unilateral, and the doing by plaintiff of the things specified in it constituted the consideration which made the promise binding, if at all, upon the defendants.
The gist of the doctrine of champerty and maintenance, as known to the common law, and as still preserved in the statutes of some of the states, is practically the same, and the principles underlying them are substantially alike, they differing only in the modes of compensation. They arose at *269 an early day in England from causes peculiar to the state of society in which they were established. From this condition of society, and the practices then commonly indulged in, there arose a well-founded apprehension that justice itself was in danger. The object of the laws in reference to these two subjects was, as happily expressed in an old English case: “To repress the practices of many, who when they thought they had title or right to any land, for the furtherance of their pretended right, conveyed their interest in some part thereof to great persons, and with their countenance did oppress the possessors. The power of great men to whom rights of action were transferred in order to obtain support and favor in suits brought to assert those rights, the confederacies which were thus formed, and the oppression which followed from the influence of great men in such cases are themes of complaint in the early books of the English law.” So commonly was this indulged in, and so serious were the results in those days, that Blackstone speaks of these offenses as perverting the process of law into an engine of oppression. 4 Blk. Com. 135.
Rich and powerful barons would buy up claims, and by means of their exalted and influential positions overawe the courts, secure unjust and unmerited judgments, and oppress those against whom their anger might be directed. Out of this doctrine, and to assist in the prevention of these evils, arose also the common-law rule, which prohibited the assignment of choses in action, and the sale and transfer of land held adversely. The progress of law, enlightenment and civilization during the last few hundred years has, however, to a large extent obviated the necessity of these stringent rales. The conditions of society which rendered them necessary and imperative to the pure administration of justice have vastly changed, and the reason for the doctrine having failed, the doctrine itself has to a large extent become obsolete, and is no longer enforced, unless expressly preserved by statute. In England itself, the doctrines have in modern times been modified to a very great extent. The statutes for the limita *270 tions of action; the statutes of frauds; provisions for actions for malicious prosecution, and for the costs to be taxed against unsuccessful parties, have all been enacted or provided in that country since the law of maintenance was established, and these have contributed almost wholly to prevent or punish groundless and vexatious litigation, which the doctrines of champerty and maintenance were intended to prevent. Thallhimer v. Brinckerhoff, 3 Cowen (N. Y.), 623.
But more especially in the United States have the reasons for these doctrines no existence. Here there are no privileged nor aristocratic classes, all being equal before the law, and it has never been charged that there was fear in this country of the courts being improperly dominated by such influences as were dreaded by our ancestors a few hundred years ago. In addition to this, guarding against any such dangers, as we then anticipated, we have in all of the states, as in England, numerous statutes affording protection against the evils then dreaded, — statutes of limitations and of frauds; the taxing of costs against the unsuccessful party; statutes requiring suits to be prosecuted in the names of the real parties in interest; suits for malicious prosecution, etc. In none of the states, therefore, are the doctrines or laws of champerty and maintenance preserved in their original rigor. In many, they are declared to be obsolete, and to have no existence at all; in others, they are preserved, — in a greatly modified form, however, — and then most generally by special statutes.
In Roberts v. Cook, 20 Howard, 467, the United States supreme court expressly says: “ The ancient and English doctrines of champerty and maintenance have not found favor in the United States.”
In New York it has also been held that they exist only as defined and provided by statute. Sedgwick v. Stanton, 14 N. Y. 289; Mott v. Small, 20 Wend. 212. And so it is held in a large number of the states. In the states generally, choses of action are now assignable, and so may land held adversely be sold and transferred. Considering the state of *271 society and conditions which now prevail in this country, to transfer the right of action, or to maintain the suit of another without having any direct or contingent interest in it, will by no means necessarily produce mischief or oppression. Indeed, it may be said on the other hand that such assistance or maintenance may have a tendency to secure rights and promote the ends of justice. A poor man may have the right upon his side, but be without means to enforce such rights in the courts, and possibly against some powerful adversary. Surely, it cannot be said that in such case it is the intent of the law to prohibit a friend from assisting him with the necessary money to enforce his rights, dependent for his reimbursement solely upon the contingency of securing a portion of the property which may be obtained by the litigation, this being the only security or chance for repayment which the party could give or have. It is a matter of common knowledge — in legal circles at least — that such are not unusual occurrences.
Another reason why the old laws of champerty and maintenance are considered obsolete in most of the states, except as preserved by statute, is, that the doctrine is still recognized and applied where occasion requires that courts will not enforce contracts which are contrary to public policy or against good morals. This doctrine of the law of itself affords ample remedy and protection against the evils which the laws of champerty and maintenance were intended to prevent. These views are, we think, in entire accord with the weight of authority and with the doctrines announced by the best considered cases in which the questions have been considered. We cite a few in addition to those to which we have referred: Brown v. Biyne et al., 21 Ore. 261; Fowler v. Callan et al., 102 N. Y. 395; Duke v. Harper, 2 Mo. App. 1.
We are not, however, entirely without adjudication in this state upon these matters. In Kutcher v. Love, 19 Colo. 546, the supreme court said: “In this state we have a statute defining and punishing both barratry and officious intermeddling in suits, and these supercede the common-law offense *272 of champerty,” and cited in support of the proposition Newkirk v. Cone, 18 Ill. 449.
To this same effect is Mining Co. v. Bentley, 10 Colo. App. 271.
It is said, however, that although the common-law offenses of champerty and maintenance may be obsolete in this state, yet we have a statute on maintenance to which this contract was obnoxious, and by reason of which it should be void. Gen. Stats, sec. 815.
This statute provides, in substance, that if any person shall officiously intermeddle in any suit at common law, or in chancery, that in no wise belongs to or concerns such person, by maintaining or assisting either party, — except it be a kinsman, or servant, or poor neighbor out of charity, — with money or otherwise to prosecute or defend such suit, with a view to promote litigation, every such person so offending shall be deemed to have committed the crime of maintenance, and upon conviction shall be fined, etc. It has been held in this state, following the United States supreme court, that a contract to do a thing prohibited by statute is not necessarily void if the statute visit the unlawful act with a penalty, if the thing prohibited is malum in se, the contract will not' be enforced, not because of the statutory prohibition, but because of its being against public policy and good morals. The contract might be enforced if the thing to be done was not immoral nor against public policy. Mining Co. v. Bank, 1 Colo. 548; Harris v. Runnels, 12 How. 79.
It will be seen, however, by even a cursory examination, that the gist of this offense, as defined by statute, is the untent or purpose with which the act is done. It must be done with a view to promote litigation. This accords with the modern construction of the doctrine of champerty and maintenance where such doctrines prevail at all, and is confined to cases where a man, for the purpose of fomenting and stirring up strife and litigation, encourages others either to bring actions, or to make defenses which they have no right to make, or otherwise would not make. Such interfer *273 ence or intermeddling is justly considered as having a tendency to pervert the course of justice. In the case at bar, it appears that the defendants contemplated and desired the bringing of suit -to assert their rights, and that it was a suit without foundation, and which they had no right to bring is sufficiently disproved by the munificent results which by it they secured. The chief object of the old law of maintenance was to prevent harassment of individuals by the institution against them of suits without merit, the prosecution of them by illegitimate means and the tendency to corrupt the fountains of justice by perjury and other disreputable methods to which parties would resort in order to secure success in the litigation. It was never intended, although possibly such cases might have come within the strict letter and reading of the old rule, to prevent poor persons from charging the subject-matter of the suit in order to secure the means to assert and enforce their rights by legitimate methods and in a legitimate manner. 1 Addison on Cont. 392; Stotsenburg v. Marks, 79 Ind. 193.
The better doctrine is, that such contracts are not per se void, but become so, and will not be enforced from’reasons based upon considerations of public policy and good morals if it appears that they were entered into, not with the bona fide object of assisting a claim believed to be meritorious and just, but for the purpose of injuring and oppressing others, or for the purpose of gambling in litigation, or for the purpose of stirring up strife inducing suits to be begun which would otherwise not be commenced.
The difference between the offense of maintenance, as prescribed by our statute, and that at common law, as defined by the best authorities, is apparent at a glance, and quite significant. Mr. Bouvier, in his law dictionary, a standard authority, defines it to be: “A malicious — or at least officious —interference in a suit in which the offender has no interest to assist one of the parties to it against the other with money or advice to prosecute or defend the action without any authority of law.”
*274 Hawkins’s definition, as laid down in Brown v. Bauchamp, 5 T. B. Mon. 413, is: “ Maintenance signifies an unlawful taking in hand or upholding of quarrels or sides, to the disturbance or hindrance of common right.”
Construing the language of our statutes by a consideration of the history of the law of maintenance, and the evils which it was intended to prevent, we think that the contract in question can in no.wise be considered obnoxious to it. It does not disclose upon its face any officious intermeddling, with a view to instigate litigation, because it recites the desire of the defendants to prosecute their rights, and a reasonable presumption from the language used would be that it was their intention for this purpose to institute suit, or to cause suit to be instituted in their behalf. There is nothing upon the face of the contract to indicate that the plaintiff induced the bringing of a suit which would otherwise have not been commenced, or that the acts to be performed by him were for the promotion of litigation in the sense in which those words are used in all the authorities; but, on the contrary, a conclusive presumption from the language used, and from the results obtained by the suit, is, that they were to aid a legitimate suit to be instituted in good faith — not for the purpose of stirring up and encouraging strife — but for the legitimate purpose of enforcing legitimate rights. We think, therefore, that nothing was disclosed upon the face of this contract, or upon the face of the complaint, — which are the only questions before us, — to show that the contract was inhibited by the statute. A bare suspicion that under the stimulus of such a contract a party might do some prohibited act, would not be sufficient to justify a court in declaring it void. There must be something in it to indicate that its natural tendency would be to produce such an effect. In cases where the terms of a contract admit of two meanings, if it can be so construed according to its language as to make its purposes and objects, and the acts required under it, lawful, it is the duty of a court to so construe it, at least until some evidence should be produced showing that unlawful *275 acts were intended or were perpetrated in its furtherance. Wyatt v. Irrigation Co., 18 Colo. 313; Bishop on Contracts, § 392.
In his oral argument, however, counsel for appellee devoted himself exclusively to the contention that even though the common-law rules as to champerty and maintenance were obsolete, and did not prevail in this jurisdiction, and independent of our statute on maintenance, to which we have referred, the contract was void and should be so declared, because it was against public policy and good morals. If the contract were of such a character, there is no question but that the result would be as contended for by counsel. It would be the duty of the court in such case to declare the instrument void and incapable of enforcement. No principle of law is better settled than this. It is equally well settled, however, that this doctrine should not be applied except where the case is free from doubt. The power of courts in this respect being according to all authorities undefined, and hence an exceedingly delicate one, the exercise of such power is an interference with the right of contract, not in the interest of either party to it, but in the interest of the public and of the pure administration of justice. Hence, before an agreement may be declared void on these grounds, it must clearly appear that it is obnoxious to them, and that it is manifestly injurious to the interests of the public. The reason of this rule is based upon another rule which is as well settled as any principle of the law. Freedom of contract is essential to that unrestricted trade which the spirit and enterprise of the age demands, and especially in countries lite this boasting’ a republican form of government. The rule is thus aptly defined by an eminent English judge:
“ It must not be forgotten that you are. not to extend arbitrarily those rules which say that a given contract is void as being against public policy, because if there is one thing more than another public policy requires, it is that men of full age and competent understanding shall have the utmost liberty of contracting, and that their contracts, when entered *276 into freely and voluntarily, shall be held sacred, and shall be enforced by courts of justice. Therefore, you have this paramount policy to consider, — that you are not lightly to interfere with this freedom of contract.”
This doctrine, as thus happily expressed, is indorsed and followed by all American authorities without exception. Bearing in mind these general rules, was the contract before us void on this ground ? It did not require the plaintiff to furnish evidence sufficient to win the case, nor testimony generally tending to that end. It did not require him to suppress any evidence, so that a fraud might be perpetrated and the courts made the instrumentality of doing an injustice or wrong; it did not 'even require the plaintiff to himself become a witness, or to furnish any testimony for defendants on the trial; it did not require him to do any act which, in our opinion, even under the most strained construction, could be held liable, or tending to obstruct the administration of justice. On the contrary it required him simply to furnish evidence which was in his possession at the time of and prior to the execution of the contract. The character and nature of the evidence so required is specifically stated in the agreement, and it was not such that upon principle the furnishing of it would be prohibited by any rule of public policy. It cannot be said that the production of it would involve a dereliction of duty on the part of the plaintiff to the public or to any person, a breach by him of any trust or confidence reposed in him by others, and which good morals or good policy might condemn; nor the commission by him of any act of the slightest moral turpitude or immoral tendency or taint. Per contra, the only reasonable conclusion from the statement of the contract as to the evidence, is that the furnishing of it would not necessitate nor require the commission by plaintiff of any act having the slightest taint of immorality. The natural. presumption is that the evidence to be produced was record evidence, and this is confirmed by the statement in the answer of the defendants, that the evidence of citizenship of the father of the defend *277 ants, which plaintiff claimed to have discovered and have in his possession, was obtained by him, as he claimed, through an examination of the public records in the general land office of the United States at Washington.
Mr. Greenwood thus concisely states the rule of public . policy in regard to agreements of this character:
“But an agreement to pay one for the disclosure of instruments for proof of claims asserted in courts of justice is valid, unless the production of the same could be a dereliction of duty on the part of the person producing the evidence.” Greenwood on Public Policy, rule 374, p. 444.
The doctrine here announced finds general approval by the authorities. We cite a few out of the many which sustain it and which support the views which we have expressed. Cobb v. Cowdery, 40 Vt. 25; Lucas v. Pico, 55 Cal. 126; Wilkinson v. Oliveira, 1 Bingham’s New Cases, 733; Fowler v. Callan, supra; McCandless v. Steel Co., 152 Pa. St. 150; Beach on Contracts, § 1498, et seq.
In the first three of these cases, the facts were very similar in principle to the case at bar. In the Vermont case, one. of the contracting parties agreed to disclose his knowledge in respect to facts which were material on the trial of a cause in which the others were interested, and the names of witnesses by whom the facts could be proved. The court held that it was not against public policy, and was not illegal. It said: “ It was a contract to give information in respect to evidence, — to disclose, and not to suppress, the truth, — and the tendency of the disclosure cannot be regarded as, in any respect, interfering with or obstructing the administration of justice.”
In the California case, a party agreed for a specified sum to be thereafter paid by another, and for which a note was executed, to sell to such other certain information or evidence which he had in reference to a certain title to land. The court held the contract to be a valid one, there being nothing in it which violated good morals or was against public policy.
*278 In onr discussion of this last proposition advanced by appellees’ counsel against the validity of the contract, we have not alluded especially to his claim that it was invalid because against good morals. Our reason is that if it were against good morals, it was also against public policy; the one is embraced in the other, and a discussion of the latter obviates the necessity of separately and specifically considering the other. We conclude, therefore, that there was nothing upon the face of this contract showing, or tending to show that its provisions were contrary to public policy, or against good morals. This conclusion being arrived at, it necessarily follows that the judgment of the trial court must be reversed. The complaint states upon its face facts sufficient to constitute a cause of action.
We think there is no force in the claim of defendants, that even though the contract does not show upon its face sufficient to invalidate it under any of the rules which we have been discussing, certain averments of the complaint accomplished this purpose. Counsel base this contention upon this allegation in the complaint, and this only, “that he (plaintiff) furnished the said attorney all the information and evidence called for in said contract, and all other evidence necessary to institute proceedings for the recovery of the property claimed,” etc.
It might be a sufficient answer to this to say, that this purported to be, and was, only a suit upon this contract, and that the latter part of this allegation was therefore surplus-age, and might very properly have been stricken out on motion. The contract did not require plaintiff to furnish any evidence, except that specifically stated in it. In addition to this, however, the allegation was that he furnished the attorney other evidence necessary to institute proceedings— not evidence used or to be used on the trial — and hence no reasonable presumption could arise that the furnishing of such information, whatever it was, had a tendency to impede or obstruct justice, or interfere with its administration by the court; or to encourage perjury or the commission of any *279 other act. A not unreasonable inference would be from the connection in which the statement is made, that the word “ evidence ” was used in this case as synonymous for or in place of “ information.”
None of the numerous authorities to which counsel for defendants have cited us militate on principle against the views which we have expressed.
In Quirk v. Muller, 14 Montana, 471, the contract in question required the party, in effect, to procure and furnish testimony that would win a lawsuit, and the allegation in the complaint when suit was brought to enforce the contract, was that the testimony which the party procured did win the lawsuit. It is clear that this contract was obnoxious to the settled rules of public policy, because it is manifest without argument that here was a broad inducement to perjury and to the subordination of witnesses.
Goodrich v. Tenney et al., 144 Ill. 422, was a case wherein an attorney agreed to secure the testimony of a debtor who had absconded after defrauding his creditors, and of certain other parties, to be used in a proceeding to declare fraudulent a sale of certain property made by the debtor before he had absconded. In this case, the debtor was brought back from Canada, under an agreement that he should not be arrested for his fraud, and that his debts should be cancelled, and that he should be paid a certain sum of money if he would testify .as required, and the court say:
“ And the testimony was procured by appellant, who after planning with the attorney as to the wording of his false testimony, deliberately gave it for no other reason than that he was led to believe that his telling the truth would endanger the chances of success in the litigation against Lowey.”
The facts were wholly different from those in the case at bar. The party had agreed in his contract that the testimony of the debtor and others which he was to furnish should show clearly that the transfer of the property made by the debtor was fraudulent and without consideration. This is in every respect different from the case at bar.
*280 In Lyon v. Hussey, 31 N. Y. Supp. 281, the party to the contract was, in addition to employing counsel and paying costs in a suit, to “ obtain the evidence to establish the defendant’s claim.” In this, as in the other cases, it is quite manifest, the contract being in effect to furnish the testimony requisite to win the case, was a strong inducement to perjury.
These are a few of the strongest cases to which counsel have cited us, and we are clearly of the opinion that they are not at all in point; that they do not involve the principle which is controlling in this case. It may be said that the evidence which plaintiff was required to furnish was necessary to a successful termination of the suit, but it was already in the possession of the plaintiff, and we cannot see how the furnishing of it under such circumstances tended or might tend to incite perjury, or the commission of any other act tainted with immorality. We find nothing in the contract, nor in the interpretation of it by the complaint, that required plaintiff to furnish, or that he undertook to furnish, or did furnish, all other or any other testimony and evidence necessary to a successful termination of the suit. What might be shown upon a trial of this cause, we of course do not know, and cannot anticipate. We have endeavored to restrict ourselves in this opinion strictly and exclusively to the question before us, namely, whether the complaint stated sufficient facts to constitute a cause of action upon which plaintiff might recover; and we do not desire that any expression which we have used may be considered as an intimation of our opinion upon questions which may arise during the trial of the cause.
For the reasons which we have given, we think that the court erred in its judgment of dismissal, and such judgment will be reversed.

Reversed.

Thomson, J., not participating.