## BUTLER v. DAVIES.

### No. 1935.

Circuit Court of Appeals, Tenth Circuit.
Jan. 15, 1940.

Rehearing Denied Feb. 19, 1940.

Ernest C. Smith, of Hood River, Or., and James D. Parriott and Frederick P. Cranston, both of Denver, Colo., for appellant.

Carl J. Sigfrid, of Denver, Colo., for appellee.

Before PHILLIPS, BRATTON, and HUXMAN, Circuit Judges.

BRATTON, Circuit Judge.

John Lawton Butler instituted this suit against William Davies. These facts appear from the face of the complaint and the attached exhibits. Davies owned two mining claims in Hinsdale County, Colorado. He entered into a written contract with Mabel Thompson and M. E. Hiatt in which he leased from them for a period of five years three lode claims situated in the same county. The contract provided that he should have the right to purchase at a fixed price the lode claims at any time before the expiration of the lease. While the lease was in effect Davies, joined by Mabel Thompson and Hiatt, entered into a contract with John W. Vickers in which all five claims were leased to Vickers for a period of five years from that date. The contract vested in Vickers the right to purchase the property for $45,000. San Juan Gold, Inc., acquired by assignment the rights of Vickers and went into possession of the property. Davies became dissatisfied with Vickers and San Juan Gold, Inc., in respect of their performance under the contract. He represented to Tate, agent for Butler throughout, that they had violated and forfeited the contract and their rights under it; he sought to have Tate purchase such property, to furnish him money and assistance with which to acquire title from Mabel Thompson and Hiatt, and to finance a court action for the purpose of obtaining possession for Butler, as purchaser; and he proposed that all moneys advanced and furnished together with $1,000 in addition be applied on the purchase price. Such representation, request, and proposal having been made, Davies and Tate entered into a written contract in which Davies leased all of such claims to Tate for a period of four years. The lease recited that the property was in the possession of San Juan Gold, Inc., and that it was free of any claim, lien, demand or incumbrance, except a certain alleged lease claimed by Vickers; and it provided that Tate should have the right to purchase it for $45,000, payable $75 per month beginning January 1, 1933, and continuing to and including November 1, of that year $5,675 on or before November 1, 1933, $8,500 on or before November 1, 1934, and $10,000 on or before November 1, 1935, 1936, and 1937, respectively. It further provided that Tate should have the right to institute any action deemed advisable to secure possession of such premises, subject to payments aggregating a fixed sum having been made;.

that if Tate should elect to institute such action he should bear all costs; that in the event such action be instituted and result in the existing lease to Vickers being sustained, Davies should repay to Tate all sums which had been paid plus $1,000, such payment to be made out of the money which Vickers was required to pay Davies; and that in the event Tate should make the monthly payments of $75, and Vickers should fail to make a certain payment required in his contract, Tate should have the right to take possession of the premises and all payments which had been made together with $1,000 in addition thereto should be applied on the purchase price. On the following day Tate paid Davies $1,500 and they entered into a supplemental agreement in which it was provided that in the event the Vickers' lease should be held valid, Davies would repay that sum, together with an additional $2,000 to cover the various disbursements which Tate had made in bringing the negotiations to their then status and to compensate him for the time and effort which he had exerted, but that in the event the Vickers' lease be found invalid the $1,500 and the $2,000 should be applied on the purchase price. Tate subsequently advanced Davies $4,250 and it was then agreed that should the Vickers' lease be sustained Davies would repay the amount out of the first amount due from Vickers but in the event the Vickers' lease should not be upheld and Tate should take the property, the sum advanced should be applied on payments due under the original contract. And still later it was agreed that on consummation of the sale a further sum of $3,000 should be deducted from the sale price, but should the Vickers' contract be sustained such amount should be paid to Butler out of the next money Davies received under the Vickers' contract. A suit was instituted in the state court in the name of Davies against Vickers and San Juan Gold, Inc., to cancel and annul the contract under which they claimed. A decree was entered sustaining the contract, and Davies appealed. Butler advanced to Davies the money with which to defray the expense of the litigation. While the case was pending in the supreme court, Vickers or his assignee deposited in the registry of the court $45,000 as the purchase price of the property. Davies accepted the money and the suit was dismissed. Davies then refused to account to Butler in any sum.

This action followed to recover the money advanced and the sums agreed to be paid in addition. The answer challenged the sufficiency of the complaint to state a cause of action for which relief could be had. The court sustained the challenge, holding that the contract appeared on its face to violate section 182, chapter 48, Colorado Statutes Annotated 1935. Plaintiff declined to plead further, and the court dismissed the action.

■ The contract was executed in Colorado, it relates to property located in that state, and therefore its validity must be determined by the law of that state. Erie Railroad Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188, 114 A.L.R. 1487.

■ Champerty as it existed at common law does not obtain in Colorado. Casserleigh v. Wood, 14 Colo.App. 265, 59 P. 1024. But section 182, chapter 48, Colorado Statutes Annotated 1935, supra, provides that a person who officiously intermeddles in a suit at common law or in chancery which does not concern him, by maintaining or assisting either party with money or otherwise to prosecute or defend it with a view of promoting litigation, shall be deemed to have committed the crime of maintenance; provided that the assistance of a kinsman, servant, or poor neighbor out or charity shall not constitute maintenance. The statute was considered in Casserleigh v. Wood, supra. There plaintiff and defendants entered into a written contract which recited that defendants were sons of the late William J. Wood, that they desired to recover at law or by compromise and settlement their interest in certain mining property claimed by third persons, that in order to recover such interest it was necessary to establish the citizenship of their deceased father, and that plaintiff had in his possession certain evidence, deemed valuable for such purpose, which he had procured at large expense and much time. It then provided that defendants should give to plaintiff a two-thirds interest in the amount recovered through legal proceedings, and a one-fourth interest in the amount recovered through settlement without legal proceedings; that plaintiff should cause all proceedings necessary to a settlement to be commenced forthwith; that he should bear all costs in the matter; and that defendants should give their testimony when requested. Litigation was instituted, financed

90

by plaintiff. Recovery was had, and plaintiff sued to recover his interest in the property as provided in the contract. The validity of the contract was challenged for being champertous and for violating the statute. The court said that champerty as it existed at common law did not obtain in Colorado, that the statute was confined to cases in which one acts for the primary purpose of fomenting and stirring up litigation, and that the contract did not come within its strictures or contravene public policy but was valid and enforceable. In Wood v. Casserleigh, 30 Colo. 287, 71 P. 360, 97 Am.St.Rep. 138, the court said that before a contract can be declared illegal for violating public policy it must clearly appear that it is obnoxious to the pure administration of justice, or manifestly injurious to the interest of the public, and that the test for determining that question is whether the tendency of the agreement is evil. It was held that the contract in question bore no taint of immorality, was not obnoxious to the pure administration of justice or injurious to public interest, and therefore was not void for violating public policy. An identical contract made with another heir was held invalid in Casserleigh v. Wood, 8 Cir., 119 F. 308; but the rule of decision declared by the courts of Colorado is controlling.

 Here the facts alleged in the complaint and appearing from the attached exhibits must be accepted as true. According to them, Davies became dissatisfied with the manner in which Vickers and his assignee had performed the obligations required of them under their contract; he represented to Tate that they had violated the contract and forfeited their rights under it; and he then initiated the negotiations with Tate by requesting Tate to purchase the property, furnish him with money with which to acquire title from Mabel Thompson and Hiatt, and finance litigation to obtain possession from Vickers and his assignee. Tate did not inspire Davies to become dissatisfied with the manner in which Vickers and his assignee were performing or to reach the conclusion that they had breached the contract and forfeited their rights under it or to desire the institution of litigation to judicially cancel such contract, and he did not initiate the negotiations with Davies. Davies, of his own accord, became dissatisfied, reached the conclusion that Vickers and his assignee no longer had any rights in the property, and desired the institution of litigation against them; he advised Tate of his conclusion in that respect; and he originated the negotiations with Tate. If Davies was right in his conclusion, he was at liberty to enter into the contract with Tate. By the terms of the contract, Tate acquired rights in the property as lessee with an option to buy. The contemplated litigation which he was to finance was necessary to determine whether Vickers or his assignee had forfeited his contract and therefore whether Davies could convey the property to Tate. Tate was not a mere officious intermeddler in litigation which was of no concern to him, and he did not obligate himself to finance it merely to stir up strife or promote vexatious litigation. And there was no gambling or speculation on his part. The sums advanced and the additional amounts specified were to be applied on the purchase price of the property or repaid to him, depending upon whether the Vickers' contract was upheld. He was to receive the benefit of the same aggregate amount in either event. He stood no chance to lose so long as Davies performed the obligations required of him. The contract was not immoral and its tendency was not evil. It, therefore, did not violate the statute or contravene public policy of the state. Casserleigh v. Wood, Colo., supra; Wood v. Casserleigh, Colo., supra.

The judgment is reversed and the cause remanded for further proceedings not inconsistent with the views expressed herein.